UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA

        Plaintiff,

    v.

IAN BLOCHWITZ,

        Defendant.

**REDACTED PUBLIC VERSION**

Case No. 25-CR-7-WJS

**DEFENDANT IAN BLOCHWITZ'S**
**SENTENCING MEMORANDUM**



*Attorneys for Defendant Ian Blochwitz*
Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com

**Introduction**

Ian Blochwitz always has been a survivor. From a very young age, he faced enormous adversity. Only through perseverance, hard-work, and the loving support of those who believed in him did Ian overcome such adversity. Being a survivor helped Ian graduate college and infused him with courage to become an entrepreneur. But Ian's upbringing did not just impart Ian with armor – it also left him with scars. These scars contributed to depression and difficulty trusting others. Later in life, these scars led Ian to seek companionship online in the anonymity of the internet. He spoke to people online, knowing little about them. One of those people was MV1, the victim in this case. MV1 told Ian that she was underage. Ian doubted the veracity of that claim, but, nonetheless, Ian traveled to meet MV1. He picked up MV1 in his car and brought her to an Airbnb in New York, a few minutes from Vermont. While inside the room, Ian touched MV1's genitalia with a vibrator. This is what led to his arrest and the conviction in this case.

As set forth in greater detail below, Ian Blochwitz is a person who made an incredibly poor choice to visit a minor he met on the internet for the purpose of engaging in sexual activity. He admitted to this grievous error by pleading guilty to this crime. He did so to accept accountability for his actions. Yet, he is not the type of offender who requires commitment to prison for decades. His acceptance of responsibility, lack of criminal history, and strong support of family and close friends make that unnecessary. For these reasons, the Court should adjudge the mandatory minimum sentence in this case (ten years) and ten-years of supervised release.

**Argument**

**A. Who is Ian Blochwitz?**

Ian is the biological son of Richard Hunt and Michelle Sardo. Born just prior to Christmas in 1991, neither of Ian's biological parents were prepared to parent Ian appropriately. Richard was a drug addict. Michelle suffered from mental health issues, to include schizophrenia.

As a result, Richard's family, including his sisters, stepped in when they could to help Ian. But Michelle's sisters had their own responsibilities. His older sister had four children and lived in Virginia. His younger sister, Sharon Donovan, was married and in an abusive relationship. Neither could assume the responsibility for Ian. When Richard and Michelle had another boy, Aaron, when Ian was just a toddler, the state intervened and placed Ian and Aaron into foster care. This ended Ian's relationship with his parents. Richard and Michelle went on to live their lives with little contact with their children. Both died a few years ago as a result of their life-long ailments.

After Child Protective Services intervened, Ian and his brother Aaron were placed with a foster parent, Denise Metzger. Denise Metzger was recently divorced and had no children.



She lived in Clarence, New York, a suburban bed-room community north of Buffalo. Clarence contained a mix of tree-lined streets and larger rural and agrarian neighborhoods. Denise lived in a neighborhood with houses closer together.

Denise was a piano and music teacher. She had family and friends in town. She yearned for children that her divorce could not deliver. She invited Ian and Aaron into her home to start a new way of life.

Ian was two-years old when Denise took custody the boys.  Aaron was just a baby.



Denise attempted to provide stability to Ian – something Richard and Michelle never provided. Ian and his brother played in Denise's backyard. They obtained medical care.  They went to therapy, school, and church.  Ian also formed a bond with Denise's parents, Roger and Marie Metzger, who lived a short drive from Denise's home.  Roger worked for the town Building Department.  Marie performed clerical work and volunteered.  Both were blue collar and aimed to teach the boys to work with their hands and play outside. They also endeavored to help their daughter Denise navigate being a first-time parent.



Roger and Marie took an immediate liking to Ian.  They enjoyed his inquisitiveness. They admired how he kept his room tidy and played with his brother Aaron.  Roger and Marie expected their grandchildren to be polite and show respect towards adults and others.  Ian displayed those traits, even as a young boy.  Roger noticed how Ian was fascinated by mechanical items.  He helped Ian understand how things worked and taught Ian how to work on engines and other items. Marie held an avocation as a seamstress.  She made Ian and his brother pajamas and pillowcases. Ian did not loose sight of the affection his grandparents displayed towards him.  Even to present day, he still has the pillow cases Marie made for him as a little boy.

3



After fostering Ian and Aaron, Denise also agreed to foster two other children, Corey and Carey. Similar to Aaron, Denise took custody of Corey and Carey when both boys were babies. Around the same time, Richard Hunt and Michelle Sardo continued to spiral out of control. CPS moved to terminate the parental rights of both of Ian's birthparents. There was little opposition. After the court terminated that legal relationship, Denise moved to adopt Ian and

Aaron. The court approved this request in 1993. At a ceremony attended by the Metzger family as well as Ian, Aaron, Corey, and Carey, Denise formally adopted Ian and his brother. Ian was



overjoyed. As the oldest, he sat next to his new mother as she signed the adoption paperwork.

Ian believed that Denise would offer him the love and support that he never enjoyed with his birthparents. Ian's wish held true for a period, but his relationship with Denise did not materialize into the loving relationship Ian yearned for. Denise had a secret. She liked babies, but was not as enamored with Ian who was older than Aaron, Corey, and Carey. Unbeknown to Ian, Denise investigated whether she could keep Aaron, but cut her ties with Ian. When Denise discovered how difficult this would be, she developed a plan to separate Ian from his brother and her family. The scheme revolved around painting Ian as a problem-child. As Roger and Marie Metzger recount:

> Unfortunately, Denise's love for Ian did not endure. We think this had to do with the fact that Ian was the oldest of the children. When Denise fostered Aaron, Corey, and Carey, all of them started with her as babies. Denise could shape babies into her own likeness. We think she liked babies more. Ian was not a baby. He was older. Over time, Denise discussed with us how she had regrets about adopting Ian since he was older. She told us that she discussed the issue with her friends and other foster parents. All of them advised her that it was difficult to separate foster brothers who were blood relatives. In an effort to move past this barricade, we think our daughter made up a ruse that Ian was a behavior problem.
>
> For example, Denise would tell us that Ian was misbehaved. Denise would tell us about having to "protect" the other children from Ian because he was "suicidal." None of these complaints registered with us because they did not match our observations of Ian in the times that we saw him (several days a week). Denise sent Ian to school outside of her home, but she home-schooled Aaron, Corey, and Carey. Denise also was quick to criticize Ian. She would make him cry. She was hard on him. Things were not good between them. We encouraged our daughter to try to work with Ian, but she disregarded our advice.

Denise's scheme eventually worked. After making persistent complaints to her adoption agency, Denise had Ian involuntarily admitted to Brylin Hospital, an in-patient facility dedicated to treating children with severe mental health disorders. Ian was sent to Brylin when he was seven years old. Denise cut ties with Ian and did not bring Aaron to visit. Initially, Denise did not even tell her parents. When Roger and Marie Metzger found out what happened to their grandson, they were dismayed. They went to Brylin to visit Ian. They provided him essentials. They tried to convince Denise to reconsider. Roger and Marie even discussed taking custody of Ian from Denise. But Denise would not have it. She instructed Brylin to deny Roger and Marie

5

visitation.  After spending months in Brylin without a mother or family, CPS placed Ian with a new set of foster parents: Stephen and Karen Blochwitz.  This episode ended Ian's relationship with Denise.  It also ended Roger and Marie Metzger's relationship with their own daughter – the Metzgers never forgave Denise for what she did to Ian.  Faced with a choice to pick Ian or Denise, the Metzgers chose Ian.  That choice is a testament to who Denise Metzger was.

Stephen and Karen Blochwitz lived in Eggertsville, New York.  Eggertsville-Snyder is closer to the city and about a 15-minute drive from Clarence.  It is denser than Clarence, but lined



with the same tree-lined streets and neighborhoods indicative of suburbia.  Several years ago, it was voted the safest city in America.  In June 1999, the Blochwitzs did not have children when they agreed to foster Ian.  And while they were aware of the fact that Ian had a brother who remained in the custody of Denise, Stephen and Karen were not aware of the close relationship that Ian had with Denise's parents, Roger and Marie.  The Blochwitzs became aware of Ian's grandparents when Ian, through memory, called Marie Metzger on the telephone one day.  Marie Metzger could not believe it.  After hearing Ian's voice, she called CPS to investigate whether she and Roger could exercise rights, as Ian's grandparents, to have contact with Ian.  After learning about the situation, Stephen and Karen granted this wish.  They permitted Roger and Marie to get involved in Ian's life again.

In May 2002, the Blochwitzs formally adopted Ian.  Ian had a new family for the third time in his 10-year existence.  Stephen and Karen provided Ian much needed stability and love.



They did not treat him like Denise did. With this stability, Ian grew up in a normal household. He attended public school in the neighborhood. He got involved in sports and other activities. The Blochwitz family supported him. And their family



grew. After the adoption, Karen and Stephen welcomed two biological daughters. In high school, Ian was an accomplished student and played sports, and was a captain of the soccer and swim teams the . He was involved in student government. He made many friends whom with he maintained relationships well into his twenties.

Ian graduated from high school in 2010. Following his graduation from high school, Ian pursued a bachelor's degree, locally, at a community college and at the University at Buffalo. He moved out of the Blochwitzs' home when he matriculated to college. Things changed after Ian left for college. Stephen and Karen began to distance themselves from Ian. When the Blochwitzs moved into a new house, they did not provide Ian a key. When he went to the house for break, the Blochwitzs gave Ian a guest room to sleep in, not his own room. Stephen and Karen slowly stopped communicating with Ian. The Blochwitzs did not support Ian financially. This was difficult for Ian to understand. He still had the support of Roger and Marie Metzger, but loosing another family was not something that he expected.

Ian tried to soldier on.  After spending his first two years at college locally, Ian moved to Syracuse, New York and attended Onondaga Community College to pursue an Associates Degree in Nuclear Management and, later, enrolled at the College of Environmental Science & Forestry.  Syracuse is two hours from Buffalo.  In 2017, Ian graduated from SUNY ESF with a Bachelor's Degree.  During college, Ian supported himself.  He worked in restaurants and in retail.  After college, he used his degree to work in the science and engineering field and with sustainable energy and nuclear energy production.  He formed his own company to pursue independent projects in these fields.  Ian was making headway, but mostly on his own.

When the COVID-19 Pandemic struck in 2020, Ian's business suffered.  The business also suffered because an investor in the business exploited Ian.  Ian felt betrayed and was forced to cut ties with the investor and his financial support.  Eventually, this required Ian to wind down his company and seek other employment opportunities.  This was difficult for Ian to accept.  He pursued temporary employment at a Tesla factory in Buffalo and returned to service jobs as a way to make ends meet.  He was unemployed at times.  But Ian continued to push for opportunities in the energy sector.  A Swedish company took interest in his experience and offered Ian an opportunity overseas to pursue his interests.  Ian and his girlfriend discussed moving to Sweden to pursue this opportunity.  Things seemed like they were coming together for Ian, but they also were coming apart.

**B.     What led to Ian Blochwitz's arrest and conviction?**

Ian's personal life was difficult as a child.  Being abandoned by three sets of parents made him distrustful of relationships.  Not that he did not enter relationships – he had several meaningful relationships throughout the years as a teenager and an adult – but building trust with others was difficult given the number of times people close to Ian (besides his grandparents, aunt,

8

uncle, and a few friends) burned him. The experience he had with the investor in his company also colored his views. Ian was cautious with relationships as a means to protect himself.

In 2020, Ian met a woman named Alana. The couple dated and moved in together. Things progressed and got more serious. The couple grew close, but Ian also grew cautious. He was unsure if Alana was "the one." He had difficulty proposing because he did not want to get burned again, so their relationship sat idle. Alana, who was in finance, and growing older, desired something firmer. They started living separately. They drifted apart, but remained together at the same time.

Ian also sought companionship on the internet. He logged into chat rooms and spoke to strangers. These chat rooms were full of anonymous people. If you did not like someone, you just clicked to the next name. The relationships were completely transactional. The environment provided Ian with a sense of safety. He could not be burned by someone under such circumstances. For a person with Ian's life experiences, you can imagine the allure of such a place.

Of course, these chat rooms discussed sex and sexual topics, but Ian felt safe doing so. For one, it was the internet, so it was anonymous. For another, the websites he visited required age verification. In one of the rooms, Ian was introduced to MV1. MV1 also was online speaking to others. The two conversed. Ian was told that MV1 was underage. In some respects, this statement was not concerning because a lot of people said crazy things in these chat rooms. But unlike before, Ian decided to take things further with MV1. The two made somewhat spontaneous plans to meet. Ian rented a car (his car would not have survived the trip) and drove several hours throughout the night to meet MV1 in Vermont. The two met early in the morning and decided to find a hotel room. Ian looked up locations on his phone that morning which corroborates how little pre-planning went into this trip. He booked an Airbnb that was a few minutes away in New York.

9

Ian and MV1 occupied a room together at the Airbnb for several hours. They talked. Ian bought MV1 things. He produced a bag of sex toys. Ian and MV1 kissed on the lips. Ian also placed a vibrator on MV1's clitoris for a few seconds. The kissing and other sexual behavior did not last long. No penetration of MV1 occurred. MV1 did not touch Ian's private parts. And when MV1 told Ian to "stop" during some of this behavior, Ian complied with her wish. Ian asked MV1 to put on a collar with a leash around her neck. This was a BDSM item Ian brought with him in a bag. MV1 put on the collar and leash and Ian directed her around the room on all fours for a brief period. MV1 asked Ian to drive her home. Ian did so. Just prior to dropping off MV1 near her house, Ian told MV1 it was not a good idea to meet or talk again. He deleted his profile from her phone. He deleted her information from his account. Ian never contacted MV1 again. But at this point, it was too late to turn back time. What was done was done.

Approximately two months after meeting Ian, MV1 disclosed her encounter with Ian to a counselor. The counselor reported this encounter to the police. This triggered an investigation. MV1 identified the location of the Airbnb. HSI identified Ian as the person who rented the Airbnb through credit card billing and account records. HSI also recovered information regarding Ian's internet history, online accounts, and rental car records.

In September 2023, HSI executed a search warrant on Ian's apartment. Agents located the bag of sex toys used in the February 2023 trip to Vermont. Agents also seized Ian's cell phone. Later analysis of the cell phone identified a known series of CSAM involving MV2, to include one (1) image of MV2 which depicted her genitalia in a lude a lascivious manner. Forensic analysis showed that Ian accessed this one (1) image. Ian also spoke to HSI agents twice on the day of the search warrant. He did not admit to the offense directly, but genuinely sounded shocked when agents shared that MV1 was, in fact, only twelve years old when Ian met MV1 in Vermont.

10

In 2024, Ian and Alana moved in together again. Alana felt like nothing would come of the HSI investigation. Ian was not so sure, but stayed together with Alana nonetheless. On February 5, 2025, Ian was arrested for this misconduct. He has remained in custody ever since.

**C.  MV1 is physically more mature than her age would suggest. This fact places Mr. Blochwitz's interest and corresponding risk into a less concerning category.**

When I originally was retained on this case, I found it concerning that MV1 was only twelve years old. This concern was muted (somewhat) when I reviewed the evidence. While the defense does not dispute that MV1 told Mr. Blochwitz her age during one of the chat sessions, as discussed above, the believability of this statement was questionable. People in these chat rooms lie all the time. That was the experience of Mr. Blochwitz. So, he did not take this information as gospel; rather, Mr. Blochwitz evaluated the statement in the context of the situation. He was online in an environment catered towards an adult audience. He communicated with people whom he believed were older based on what was being discussed and what he was required to do to join the chat. Thus, the possibility that someone as young as twelve years old would be inside the chat room seemed remote.

On top of that, Mr. Blochwitz evaluated the veracity of this statement through what he observed on screen. MV1 used a camera to project an image of herself to others. She did not look pre-pubescent or twelve years old to Mr. Blochwitz. When I had a chance to review the forensic interviews conducted with MV1 in June 2023 and July 2023, I genuinely was surprised by how much older than twelve years old MV1 appeared. When some members of the defense team reviewed the videos, at first, I purposefully did not share the age of MV1 with them and asked them to opine about the age of MV1. My team includes several experienced attorneys who have prosecuted and defended these cases extensively and have worked with thousands of minor victims of sexually-based crimes over the last twenty years. Estimates of MV1's age ranged from sixteen

11



years old to twenty-two years old. When I revealed that MV1 was twelve years old, these experienced attorneys were genuinely surprised.

I do not raise this fact to blame MV1 for what happened; rather, I share this information so that Mr. Blochwitz's interest in MV1, in particular, and in minors, in general, can be placed into proper context. As this Court knows from its experience in these types of cases, a defendant who is sexually attracted to pre-pubescent children generally is more of a risk to society and has a greater risk of recidivism. Greater risk corresponds with a greater need to incapacitate a defendant. The facts of this case prove that Mr. Blochwitz's sexual interests do not revolve around minors alone. And the believability of MV1's statement to Mr. Blochwitz that she was twelve years old was not immediately convincing based on what Mr. Blochwitz observed. In the context of an obviously pre-pubescent minor who lacks breast or hip development, it would be fair to expect an

12

adult to cease communication immediately. Here, placing this expectation on Mr. Blochwitz is less powerful because the facts are not as black and white.

Of course, Mr. Blochwitz is guilty of the crime to which he pleaded guilty. And there were other red flags – both before his meeting with MV1 and during it – that Mr. Blochwitz should have realized and acted upon to end this encounter (or the idea of it) altogether. Mr. Blochwitz did not act on these rationalizations. He acted on impulse. This was wrong and something he must be held accountable for and treated to resist during his term of incarceration. But to argue that it is likely that Mr. Blochwitz may target minors again because he is heavily attracted to minors or because his actions in this case suggest that he targets minors and, as a result, presents a significant risk of recidivism, disregards the specific facts of this case. The facts of this case contradict that narrative.

D. **The known series of images found on Mr. Blochwitz's cell phone involving MV2 does not contain multiple CSAM images. And no other CSAM images or series were found on Mr. Blochwitz's devices.**

As discussed in the PSR, the forensic review of Mr. Blochwitz's computer and cell phone did not reveal that Mr. Blochwitz catalogued and retained hundreds of images of child pornography. The forensic review also did not reveal chat sessions with underage females wherein Mr. Blochwitz requested that these women send him contraband images. Rather, the forensic review of Mr. Blochwitz's devices revealed that 22 images of MV2 were located on Mr. Blochwitz's cell phone, but only one of those images constituting CSAM was accessed by Mr. Blochwitz. *See* PSR at 8-9. Forensic review of this and other devices *did not find* computer applications used for the sharing and downloading of extensive collections of CSAM. This is important because it places the conduct of Mr. Blochwitz into proper context. Unlike many defendants this Court sentences for involvement in these types of crimes, Mr. Blochwitz did not possess an extensive collection of CSAM that he viewed, catalogued, and shared with other purveyors of CSAM.

13

**E. The criminal activity in this case had its roots in depression. And anonymous internet chatting provided an opportunity to act in extremes.**

To understand why this occurred, one must not look too far beyond Ian's personal circumstances at the time of the offense. Ian's history of being abandoned led him to the internet and these chat rooms. The internet provided a means of companionship that did not involve a risk of getting hurt as much as "real" relationships (like his with Alana) did. This is a fact in mitigation and extenuation that cannot be overlooked.

This investigation revealed what is common in many internet sex cases: the anonymity offered by the chat room permitted Ian to engage in fantasy-like behavior that was extreme because it was anonymous and impersonal. This phenomenon, coined the "internet disinhibition effect," has been written about in psychological research. *See, e.g.,* Suler, J, *The online disinhibition effect.* JOURNAL OF CYBERPSYCHOLOGY AND BEHAVIOUR, Vol. 7, 321-326 (2004). As

Professor Suler discusses in his article, the anonymity as well as invisibility that people enjoy in a text-only conversation (like a chat-room) can lead to people saying and doing things they would not otherwise say or do. *See id.* at 332. The facts of this case are in accordance with this research. When Ian spoke to MV1 in the chat room, he often would obscure his camera and not project his image on the screen. When Ian conversed with MV1 on Snapchat, the conversations used text only. This permitted the conversations to devolve into perverse areas which is common in the universe of sexual chat-rooms where people say many

> This invisibility gives people the courage to go places and do things that they otherwise wouldn't. Although this power to be concealed overlaps with anonymity—because anonymity is the concealment of identity—there are some important differences. In the text communication of e-mail, chat, instant messaging, and blogs, people may know a great deal about each other's identities and lives. However, they still cannot see or hear each other.
>
> Even with everyone's identity known, the opportunity to be physically invisible amplifies the disinhibition effect. People don't have to worry about how they look or sound when they type a message. They don't have to worry about how others look or sound in response to what they say. Seeing a frown, a shaking head, a sigh, a bored expression, and many other subtle and not so subtle signs of disapproval or indifference can inhibit what people are willing to express. According to traditional psychoanalytic theory, the analyst sits behind the patient in order to remain a physically ambiguous figure, revealing no body language or facial expression, so that the patient has free range to discuss whatever he or she wants without feeling inhibited by how the analyst is physically reacting. In everyday relationships, people sometimes avert their eyes when discussing something personal and emotional. Avoiding eye contact and face-to-face visibility disinhibits people. Text communication offers a built-in opportunity to keep one's eyes averted.

*See* Suler (2004) at 322.

14

things in the heat of the moment that are impulsive, unconstrained, imaginary, and uttered for shock-value.

### F. The guideline range in this case suggests a maximum sentence of 135 months, but that range is inflated based on the "use of a computer" enhancement.

Based on Mr. Blochwitz's conduct and the mandatory minimum sentence of ten years, the sentencing guideline range in this matter is 120[1]-135 months based on Mr. Blochwitz having a Total Offense Level of 31 and being in Criminal History Category I. *See* PSR at 9-12, 17. When determining a sentence that is "sufficient, but not greater than necessary" in this case, it is important to note two things. First, a 135-month sentence would fall at the *top end* of the guideline range. Generally, first-time offenders, who plead guilty and accept responsibility (like Mr. Blochwitz did in this case), are not adjudged a sentence at the highest point of the guideline range absent aggravating facts. Thus, adjudging a 135-month sentence in this case would be greater than necessary for this reason alone. Second, Mr. Blochwitz's total offense level of 31 is driven, in part, by a 2-point upward adjustment imposed pursuant to USSG § 2G1.3(b)(3)(A) for using a computer during the offense. *See* PSR at 10. As set forth below, imposition of this upward adjustment is ripe for a policy objection. And if the Court did account for this policy objection, then Mr. Blochwitz's guideline range would reduce to the mandatory minimum sentence of ten years.

The upward adjustment accounted for in USSG § 2G1.3(b)(3)(A) for "using a computer" to commit the offense of conviction is a vestige of a by-gone era. This adjustment was put in place in the 1990's. While the Sentencing Commission has not opined directly on this adjustment in the context of USSG § 2G1.3 (the guideline applicable in this case), the Commission has opined how the continued application of the "use of a computer" enhancement in the context

---

[1] Of note, the bottom end of the suggested guideline range is 108 months, but is adjusted upward to 120 months due to the mandatory minimum sentence. *See* USSG § 5G1.1(c)(2) ("[T]he sentence may be imposed at any point within the applicable guideline range, provided that the sentence . . . is not less than any statutorily required minimum sentence.").

of the child pornography guideline at USSG § 2G2.1 is unwarranted. For example, in 2012 the Sentencing Commission noted how the "use of a computer" adjustment "now appl[ies] to most offenders and, thus, fail[s] to differentiate among offenders in terms of their culpability." *See* U.S. Sentencing Commission, Report to the Congress: Federal Child Pornography Offenses (2012), at iii. As the Commission explained, this enhancement "originally [was] promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail." *See id.* For these reasons, the Commission opined how applying this adjustment in the modern era was unjust because this adjustment now applies to the "vast majority of offenders," and, as a result, creates artificially elevated sentencing ranges. *See id.* at xi, 313, 324. For this reason, the Commission advocated for removing this provision. *See id.* In 2021, the Sentencing Commission reviewed the data concerning child pornography offenses again. Just like in 2012, the Commission opined that the "use of a computer" enhancement was being applied too frequently to provide a fair guideline range. *See* U.S. Sentencing Commission, Federal Sentencing of Child Pornography Production Offenses (October 2021), at 20.

But for this adjustment, Mr. Blochwitz's total offense level would have been 29, resulting in a guideline suggested sentence of 87-108 months, which would be adjusted upward to 120 months pursuant to USSG § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). Thus, Mr. Blochwitz's sentencing range would have been the mandatory minimum sentence of 120 months only. As this Court is aware, a sentencing court need not follow the sentencing range suggested by the Guidelines if it disagrees with a relevant policy reflected in the Guidelines. *See, e.g., Spears v. United States*, 555 U.S. 261, 264 (2009) (stating

16

that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"); *see also United States v. Dorvee*, 616 F.3d 174, 182-84 (2d Cir. 2010) (same).  This policy disagreement, among others that inflate the guidelines applicable to sex offenses involving minors, is why most federal courts adjudge sentences below the guideline suggested sentence in sexual abuse cases.  *See generally* U.S. Sentencing Commission, QuickFacts – Sexual Abuse Offenses FY24.

Here, there is no need for the Court to issue a variance because 120 months is within the guideline range in this case.  Furthermore, the defense does not raise this argument to object to the guidelines determined in the PSR.  Under the guidelines in existence today, USSG § 2G1.3(b)(3)(A) is properly applied.  But when fashioning a proper sentence pursuant to 18 U.S.C. § 3553(a), the Court can (and should) consider that a sentence to 120 months is more proportionate under the guidelines than a sentence greater than 120 months or close to or at the top end of the guideline range of 135 months.

### G.  Additional reasons why a sentence in excess of the statutory minimum of ten years' incarceration is unnecessary and excessive.

Recognition of a problem.  Amenability to treatment.  Willingness to change.  Education.  Family support.  Age & Maturity.  Monitoring.  Lack of a criminal history.  All of these things will help ensure that Ian will control his behavior and not commit the same type of misconduct in the future.  That is why a sentence in excess of the statutory minimum sentence of *ten years* – already, an exceedingly severe penalty – is not necessary.

Ian recognizes the wrongfulness of his actions.  As reflected in the PSR:

17

**Acceptance of Responsibility:**

26.    The defendant acknowledged the conduct underlying the count of conviction and assisted the administration of justice by entering a guilty plea in a timely manner. The defendant generally expressed remorse for his conduct and was cooperative with the probation officer conducting the presentence investigation. Based on the totality of the circumstances, there is a preponderance of evidence supporting the acceptance of responsibility adjustment.

*See* PSR at 9. This realization is echoed in his comments to family members and friends as well as to law enforcement on the date his apartment was searched. Ian knows what he did was a gross deviation from what is expected of him. He genuinely was embarrassed. The specter of being held accountable for his actions led Ian to contemplate suicide. *See* PSR at 14-15. He was hospitalized as a result of the despondence he felt. *See id.* Ian's recognition of the wrongfulness of his actions is reflected in his behavior with MV1, too. As the facts of this case make clear, Ian took steps to cut ties with MV1 when he dropped her off at her home. This is indicative of a person who understands and accepts the nature of his criminality. Persons who express these *mea culpas* through words and actions are less likely to recidivate in the future.

Ian knows that he needs treatment to address his actions in this case as well as the underlying issues that led to his behavior online. As the PSR makes clear, Ian is not averse to treatment; instead, he has embraced treatment to address many of the concerns raised by this case. *See* PSR at 14-15. Furthermore, while the PSR does note that Ian was "guarded" when discussing the instant offense with his former counselor, Kelly McCall, as well as "non-compliant" with some of her recommendations, it is important to note how therapy conducted *after* the allegations surfaced in this case is complicated. At the time these sessions occurred and Ian was, in the opinion of Counselor McCall, "guarded" or "non-compliant," Ian was cautious as a result of possible criminal charges and legal proceedings materializing. On the advice of counsel and others, he was told that he should not speak about his pending legal case to protect his rights. This is no longer the posture of his case, so Ian can be more open in therapy regarding the details of this offense. Ian also has

18

continued therapy, to the extent that he can in a local jail facility, during the pendency of this case. Importantly, Ian has stated to me and others that he is willing to address this concern head-on while incarcerated. Ian also wants to continue with therapeutic assistance following his release from jail.

These expressions are sincere and telling. These realizations are essential to taking a step towards rehabilitation. The Bureau of Prisons has an intense Sexual Offender Treatment Program that Ian can avail himself of while he is incarcerated and complete prior to his release. The recommendation for a facility for incarceration made later in this memorandum is based Ian's own research and efforts to identify the best location which can meet his personal needs that has an SOTP program. Completion of the SOTP program will assist Ian with controlling his behavior post-release. Amenability to treatment is one of the most-important indicators to successful treatment. Ian is amenable and ready to move forward.

Ian's educational level also is an important factor to consider when evaluating his future risk to the community. According to social science research, having a college degree reduces recidivism. *See* Dennis J. Stevens and Charles S. Ward, *College Education and Recidivism: Educating Criminals is Meritorious*. 48 J. OF CORRECTIONAL EDUC., No. 3, 106-111(Sep. 1997). As Stevens & Ward found when researching data nationwide:

> inmates. Data were also gathered from education and recidivism studies of 30 states. Results show that inmates who earned associate and baccalaureate degrees while incarcerated tend to become law-abiding individuals significantly more often after their release from prison than inmates who had not advanced their education while incarcerated. One

*See id.* at 106. The RAND Corporation concluded similarly in another study on the subject:

19

## Summary

When examining 71 effect size estimates from 50 studies of correctional education programs spanning 32 years of research with analyses ranging in methodological quality and rigor, the majority of studies we identified showed lower rates of recidivism among inmates receiving correctional education than among inmates who did not receive correctional education. To provide the best estimate of the causal relationship between correctional education and recidivism, we examined nine effect size estimates from seven studies that received a Level 4 or Level 5 rating on the Maryland SMS (i.e., the most rigorous research designs) and found that the odds of recidivating among treatment group members are 43 percent lower than the odds of recidivating among comparison group members. When applying these estimated odds to the most recently reported national rates of reincarceration (43.3 percent within three years of release), correctional education would reduce reincarceration rates by 12.9 percentage points on average, although effectiveness does appear to differ by program.

*See* Lois M. Davis, Robert Bozick, Jennifer L. Steele, Jessica Saunders, Jeremy N. V. Miles, *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults* (2013), available at:

https://www.rand.org/content/dam/rand/pubs/research_reports/RR200/RR266/RAND_RR266.sum.pdf.  Ian Blochwitz already has a Bachelor's Degree which makes his risk of future recidivism less.

Age & Maturity also are important considerations to factor into an appropriate sentence in this case.  Research shows that individuals with the greatest risk for child pornography re-offense or cross-over offending (i.e., commission of a sexual contact offense) are those younger than 35 years old, with high levels of pedophilia, with high levels of antisociality, with easy access to children, and with few psychological barriers to act on their deviant impulses (e.g., offense-supportive attitudes, lack of victim empathy).  *See* Babchishin, K. M., Hanson, R. K.. & VanZuylen, H., *Online child pornography offenders different: A meta-analysis of the characteristics of online and offline sex offenders against children*, 44 ARCHIVES OF SEXUAL BEHAVIOR 45-66 (2015).  Ian shares little of these indicators.  Ian currently is 34 years old.  At the time of this offense, he was 33 years old.  The evidence collected in this case does not suggest a high level of pedophilia – there was not an extensive collection of child pornography recovered from electronic media and MV1 was not a pre-pubescent minor.  Other than a DUI arrest that was dismissed pursuant to a deferred prosecution

agreement, Ian led a law-abiding life up to his arrest, so there is nothing to suggest he is antisocial. Ian also will not have "easy access" to children when he is released (he will be a registered sex offender), he demonstrated empathy to the victim, he recognizes how his actions in this case victimized children, and he did not exhibit any "supportive attitudes" to his behavior (he has not tried to rationalize or explain away his behavior to others; rather, he admitted fault and asked for help). As a result, Ian does not meet any of the risk factors for re-offending or cross-offending.

Additionally, if Ian serves the mandatory minimum sentence of *ten years'* incarceration, then Ian will be **43 years old** when he is released from custody. Research dedicated to sexual offender recidivism has repeatedly shown that as offenders age their risk of recidivism decreases. *See, e.g.,* Hanson, R. K., *Recidivism and age: Follow-up data from 4,673 sexual offenders,* 17 J. OF INTERPERSONAL VIOLENCE 1046-1062 (2002); Thornton, D., *Age and Sexual recidivism: A variable connection*, 18 SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 123-135 (2006). This should come as no surprise. Not only does a person's sex drive decline with age (which would make it less likely for re-offending in a sexually-based context), but as research into recidivism rates conducted by the U.S. Sentencing Commission reveals, as an offender gets older, he is less likely to recidivate upon his release from jail. *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed: 4/1/26). This assumption applies to rearrests, reconviction, and reincarceration. *See id.* at 22-23. At 43 years old, Ian Blochwitz statistically is less likely to recidivate. Simply put, he poses less of a risk to society than when he was younger at the time of his arrest.



Fig. 14 Reconviction Rates for Recidivism Study Offenders by Age at Release

Congress enacted super-strict sentences in sex offense cases as a means to incapacitate offenders and, thereby, protect society.  In this case, the mandatory minimum sentence accomplishes that goal by removing Mr. Blochwitz from society until the risk factors for re-offense are lowered significantly.  That is why a sentence in excess of 120 months is greater than necessary to accomplish the goals of sentencing in this case.

Ian also enjoys strong support from a core group of family and friends.  This includes his grandparents, Marie & Roger Metzger, his aunt, Sharon Donovan, and the Pera family.  Support from family and a core group of people is critical to successful rehabilitation.  Studies show that prison inmates who have more contact with their families and who reported positive relationships overall are less likely to be re-incarcerated.  *See* Martinez, D. J. & Christian, J., *The familial relationships of former prisoners: Examining the link between residence and informal support mechanisms,* 38 J. OF CONTEMPORARY ETHNOGRAPHY 201–224 (2009).  This is because family members and other core supporters provide social control and social support (which inhibit criminal activity).  *See* SAMPSON R.J. & J.H. LAUB, CRIME IN THE MAKING: PATHWAYS AND TURNING POINTS THROUGH LIFE (Harvard University Press 1993); Cullen, F.T., J.P. Wright & M.B. Chamlin*, Social support and social reform: A progressive crime control agenda.* 45 CRIME & DELINQUENCY 188-207 (1999); MARUNA, S., R. IMMARIGEON & T.P. LEBEL*,* EX-OFFENDER REINTEGRATION: THEORY AND PRACTICE 326

22

(2006), *reprinted in* AFTER CRIME AND PUNISHMENT: PATHWAYS TO OFFENDER REINTEGRATION (Willan Publishing 2004). Family members and core supporters also facilitate informal social controls that link ex-inmates to churches, law-abiding neighbors, housing, employment, and education and training opportunities that they may not be successful in obtaining on their own. *See generally* PETERSILIA, J., WHEN PRISONERS COME HOME: PAROLE AND PRISONER REENTRY (Oxford University Press 2003); TRAVIS, J., A. SOLOMON & M. WAUL, FROM PRISON TO HOME: THE DIMENSION AND CONSEQUENCES OF PRISONER REENTRY (The Urban Institute 2001). Ex-inmates lacking positive supportive relationships with others are more likely to recidivate. *See id.* The love and support Ian enjoys from his family members and friends makes incapacitation beyond 120 months unnecessary.

Lastly, post-release monitoring provides another mechanism to tack compliance. In this case, post-release monitoring includes sex offender registration and supervised release conditions. Each of these mechanisms provides a means to track Ian after he leaves prison to ensure community safety and awareness as well as Ian's individual compliance with conditions.

*          *          *

As set forth above, Ian Blochwitz is a survivor. He grew up under difficult circumstances, but he thrived when placed in a supportive, loving environment. Ian also is a self-made man. Ian did not enjoy the full support of family when he graduated into adulthood, but he put his nose to grindstone and persevered anyway. He earned a college degree and put himself through school. He was an entrepreneur in his early twenties who started his own company. He has a strong work-ethic in which no job is too small for him. And he entered into some stable, significant relationships with others. But just as Ian's upbringing conferred strengths upon him, it also brought weaknesses. Being abandoned and exploited at various points of his life made Ian cautions of trusting others. This led to depression and, ultimately, into non-productive relationships

and the internet.  This spiral culminated with the grossly inappropriate behavior that he committed in this case.

However, Ian also is someone who has demonstrated a willingness to better himself and address the issues that led to his conviction.  He recognizes what he did and why it is wrong. All of these things make long-term incapaciation unnecessary.  He is less of a recidivism risk than other defendants.  That is why the Court is justified in adjudging a sentence at the low end of the guidelines in this case (120 months).

**H.  What is a proper sentence in this case.**

First, the Court should award Mr. Blochwitz full credit for acceptance of responsibility pursuant to USSG 3E1.1(a) and (b).  He has proven his willingness to atone for his criminality.  His statements to and actions before investigators, the probation office, and the Court are consistent with acceptance of responsibility.  The Court should adopt the recommendation of the Probation Department in the PSR and reduce his guidelines calculation accordingly.

Second, the Court should not impose a fine in this case.  Mr. Blochwitz is not in a position to pay a fine.  He has no savings.  He owns no property or assets.  Mr. Blochwitz has been incarcerated and out of work for over a year.  If the Court imposed a fine in this case, Mr. Blochwitz would, upon his release from prison, find himself behind a financial eight ball that will interfere with his successful rehabilitation.  Such a penalty is overly punitive, onerous, unfair, and defeats realization of the main goal in this case for all parties: rehabilitation and reintegration into society.

Third, the Court should not assess a mandatory $5,000.00 special assessment pursuant to 18 U.S.C. § 3014.  First, the authority to impose this assessment lapsed on September 30, 2025.  *See* 18 U.S.C. § 3014(a) ("Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2025 . . . ."); *see also* Public Law 119-4, § 3103,

139 Stat. 46 (Mar. 15, 2025) (modifying the date to September 30, 2025, but not thereafter). Second, as discussed previously, Mr. Blochwitz is indigent and cannot afford to pay this assessment.

Fourth, the Court should impose the statutory minimum term of confinement of ten years/120 months – the lowest term of confinement possible in this case. It is true that Mr. Blochwitz committed a serious felony that harmed a young child, but it also is true that the statutory minimum term of confinement is within the suggested guideline range in this case. And as explained in greater detail above, the advisory sentence suggested in the guidelines is longer than 120-months because of the "use of a computer" enhancement – an enhancement that is not based on social science research, empirical methodology, or reality. This unsupported enhancement has been met (justifiably) with resistance at both the Sentencing Commission and in the courts. That is why district judges in most cases vary from the guidelines based on a policy objection to this enhancement. Imposing a sentence longer than 120-months is greater than is necessary for all of the reasons explained above. Such a sentence goes beyond whatever is necessary to ensure that justice is delivered in this case.

*Ten years of confinement* is a sentence that certainly promotes respect for the law, provides just punishment for the offense, and is within the range of punishment accorded to a serious felony. This term of confinement will incapacitate Mr. Blochwitz so that society is protected. It will provide a message to Mr. Blochwitz (and to others) that engaging in such criminality carries significant consequences. Yet, adjudging the statutory minimum penalty of 120 months rather than a sentence higher than that which may be suggested by the current guidelines also recognizes the disparities present in the current guidelines, the specific circumstances of this case, and the unique history and characteristics of Mr. Blochwitz. That is why such a term is sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2).

25

Finally, if the Court is considering a longer sentence in this case because it has concerns about recidivism, notwithstanding the evidence marshalled above – which the defense believes belies that concern – the Court can do something else to address that concern: it can impose a term of supervised release. Per statute, the term must be no less than five years. *See* 18 USC § 3583(k). Under the guidelines, the suggested term in this case is five years to life. *See* PSR at 17. Mr. Blochwitz suggests that a term of ten years is appropriate. With a 10-year sentence, Mr. Blochwitz will walk out of prison at 43 years old. Social science research and U.S. Sentencing Commission data prove how the risk of recidivism declines dramatically when an offender reaches 50 years old. *See* Section E, *infra*, at 13-14. Imposing a ten-year term of supervision will ensure that Mr. Blochwitz is supervised until he reaches that milestone. This will ensure supervision and control of Mr. Blochwitz's post-release activities and provide a mechanism to penalize Mr. Blochwitz if he deviates from those conditions. Finally, if this Court feels the need to impose supervision for more then ten years, then, in the alternative, a fifteen-year term is appropriate because it provides for supervision until Mr. Blochwitz is 58 years old – an age at which he is even less likely to recidivate.

**Conclusion**

For the reasons set forth above, this Court should impose a sentence of confinement of 120 months (10 years); no fine; a mandatory assessment of $100.00; and, a term of supervised release of ten (10) years. In addition, the Court should recommend to the Bureau of Prisons that Mr. Blochwitz be transferred to Federal Correctional Institution Elkton in Illinois because FCI Elkton is close to Mr. Blochwitz's family, offers the SOTP program, and offers various educational and vocational learning programs that Mr. Blochwitz desires to pursue while he is incarcerated. Placing Mr. Blochwitz in this facility will assist Mr. Blochwitz with rehabilitating himself and will help ensure his qualification for a legitimate job upon release from custody. And keeping him at a

location closer to family and limiting the time he is in confinement will help ensure that

Mr. Blochwitz maintains a connection with his family members and continues on the path toward

recovery.

Dated:    April 20, 2026
             Williamsville, NY

**SINGER LEGAL PLLC**
*Attorneys for Defendant Ian Blochwitz*

By:_____s/ Robert C. Singer, Esq._____
             Robert C. Singer, Esq.
             80 East Spring Street
             Williamsville, New York  14221
             (716) 222-3288
             rob@singerlegalpllc.com
